Vincent D. Slavens, Esq., SBN 217132
Eric J. Benink, Esq. SBN 187434
KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP
550 West C Street, Suite 530
San Diego, CA 92101
T: 619.232.0331| F: 619.232.4019
Email: vslavens@kkbs-law.com
ebenink@kkbs-law.com

Attorneys for Plaintiff and the Class

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT J. NEBORSKY, TRUSTEE of the Robert J. Neborsky and Sandra S. Neborsky Living Trust on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> VALLEY FORGE COMPOSITE TECHNOLOGIES, INC., a Florida corporation; LOUIS J. BROTHERS, an individual; LARRY K. WILHIDE, an individual; and DOES 1 – 100, <br><br> Defendants. | Case No.  **'13 CV 2307 MMA BGS** <br><br> CLASS ACTION <br><br> COMPLAINT FOR DAMAGES <br><br> JURY TRIAL DEMANDED |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT                    1

Plaintiff Robert J. Neborsky, Trustee of the Robert J. Neborsky and Sandra S. Neborsky Living Trust ("Plaintiff") on behalf of himself and all others similarly situated, hereby files this Class Action Complaint and alleges, based upon his personal knowledge and investigation of his attorneys as follows:

## I.

## **INTRODUCTION**

1.     This is a class action on behalf of Plaintiff and all other investors who purchased Valley Forge Composite Technologies, Inc. ("Valley Forge" or the "Company") common stock during the period of January 1, 2009 through and including February 6, 2013 (the "Class Period") who have suffered damages as a result of the alleged price manipulation scheme set forth below.  Plaintiff alleges violations of the federal securities laws against Valley Forge, and its co-founders Louis J. Brothers ("Brothers") and Larry K. Wilhide ("Wilhide").

2.     Defendants intentionally and/or with deliberate recklessness engaged in a manipulative course of business conduct in which they falsely represented to the investing public that *all* of their revenues were derived from the sale of aerospace devices, called momentum wheels, when in fact its revenues were largely derived from illegally exporting military semiconductors to Hong Kong. Defendants engaged in this illegal export scheme in order to generate millions of dollars to finance the production and marketing of the Company's recently developed counter-terrorism products and to repay loans made to the Company by insiders, including Brothers.  The sale of military semiconductors to Hong Kong was an excellent source of cash.  It drastically reduced (and eventually eliminated) the amount of equity financing the Company was required to raise through the issuance of common stock, thus preserving Defendants Wilhide's and Brothers' controlling ownership over the Company.  It also allowed the Company to repay thousands of dollars in loans to Brothers following 2009.  Defendants misled investors about the source of its revenues in order to hide their illegal conduct from

investors and United States officials.    In addition, Defendants knew that the disclosure of their illegal activity would threaten the existence of Valley Forge and would likely result in the seizure of its bank accounts by the U.S. Government.

3.    Defendants failed to disclose to investors their unlawful exportation of semiconductors to Hong Kong or explain to investors that its cash holdings were the fruits of illegal activities that could be seized at any time.    In addition, Defendants failed to disclose to investors that its export activities were subject to United States arms control regulations that could seriously and negatively impact the price of Valley Forge's common stock.

4.    Upon disclosure of the U.S. Attorney's investigation and seizure of Valley Forge's cash holdings, the company's common stock price plummeted by more than fifty percent, causing substantial damage to Plaintiff and the Class.

## II.

## JURISDICTION AND VENUE

5.    Section 27 of the Securities Exchange Act of 1934, (15 U.S.C. § 78aa), confers exclusive federal district court jurisdiction over Plaintiff's federal securities law claims.    Venue is also appropriate because Defendant engaged in acts or transactions constituting the alleged violations in this district.

6.    Venue is also proper pursuant to 28 U.S.C. §1391(b) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## III.

## PARTIES

7.    Plaintiff Robert J. Neborsky, is trustee of the Robert J. Neborsky and Sandra S. Neborsky Living Trust.    At all relevant times, Plaintiff has resided in San Diego, California.    Plaintiff purchased several thousand shares of Valley Forge's common in San Diego during the Class Period.    Plaintiff currently holds 12,000 shares, which Plaintiff purchased on the Over-The-Counter Bulletin Board

("OTCBB") stock market. Plaintiff has suffered a market loss on his stock holdings of at least $1,104 as a direct and proximate result of Defendants' manipulative scheme, misrepresentations and omissions, alleged herein.

8.   Defendant Valley Forge is, and was at all relevant times, a Florida corporation with its principal place of business in Covington, KY.   Defendants Brothers and Wilhide founded the Company in 1996.   On July 6, 2006, Quetzal Capital 1, Inc., a Florida corporation ("Quetzal"), entered into a share exchange agreement with Valley Forge.   Quetzal was a publicly traded shell corporation at the time of the share exchange transaction.   Following the transaction, Valley Forge became a wholly owned subsidiary of Quetzal.   Quetzal subsequently changed its name to Valley Forge Composite Technologies, Inc.   Since then, Valley Forge traded on the OTCBB stock market.

9.   Defendant Louis J. Brothers is an individual who at all relevant times was a co-founder of Valley Forge, as well as its President, Chairman of its Board of Directors, Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").   He owns approximately 19,404,000 shares of Valley Forge common stock (31.26% of Valley Forge outstanding shares).

10.   Brothers has more than twenty years of experience in marketing, product management and logistics in industrial applications.   He has extensive international business experience working in Europe, Russia, China and Japan. Based on his experience with international trade in technology products, Brothers must have known about the United States International Traffic In Arms Regulations.   Over the years he had developed key contacts and business relationships in various countries, including China.   Brothers had extensive knowledge of Valley Forge's product lines and to which countries it was exporting its products.   Valley Forge paid Brothers an annual salary and awarded him stock and stock options as part of his compensation package.   Valley Forge also agreed to pay Brothers commissions on sales of its counter-terrorism products.

11.    Defendant Larry K. Wilhide co-founded Valley Forge.  He was, at all relevant times, a member of its Board of Directors and Vice President of Engineering.  He owns approximately 19,404,000 shares of Valley Forge common stock (31.26% of Valley Forge's outstanding shares).  The Company paid Wilhide a salary, as well as stock and stock options.

12.    Wilhide has extensive experience in designing products for aerospace bearing applications including cage, retainer design and spherical bearing refurbishing.  Based on his experience with international trade in technology products, Wilhide must have known about the United States International Traffic In Arms Regulations.  As Vice President of Engineering he had, at all relevant times, extensive knowledge of the products Valley Forge was exporting and to whom it was exporting those products.

13.    Doe Defendants 1 through 100, inclusive, are sued herein under fictitious names.  Their true names and capacities are unknown to Plaintiff at this time.  When ascertained, Plaintiff will amend this complaint by inserting the true names and capacities herein.  Plaintiff is informed and believes, and on that basis alleges that each of the fictitiously-named Defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiff's and the Class' rights and interests were prejudiced on account of the actions of Doe Defendants and/or that the Doe Defendants have legal responsibility for the prejudice inflicted upon Plaintiff and the Class.

## IV.
## <u>CLASS ACTION ALLEGATIONS</u>

14.    Plaintiff brings this class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class comprising of all persons who bought or otherwise acquired Valley Forge common stock during the period of January 1, 2009 through and including February 6, 2013 and who suffered damages thereby (the "Class").  Excluded from the Class are Defendants named

herein, members of the immediate families of Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest and assigns of any such excluded party.

15.    The Class is so numerous that joinder of all members is impracticable. As of March 30, 2012, the Company had approximately 62,416,048 shares of common stock issued and outstanding, and such shares were publicly traded on the OTCBB.  The Company had approximately 1,733 shareholders as of March 30, 2012.    The exact number of class members is not known at this time, but is believed to be well over one thousand.

16.    Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interest that is contrary to the interests of the Class members he seeks to represent.  Plaintiff has retained competent attorneys who are experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

17.    Plaintiff's claims are typical of the members of the Class, because Plaintiff and all of the Class members sustained damages arising from the same wrongful conduct complained of herein.

18.    A class action is superior to all other available methods for fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the class may be relatively small, the expenses and burden of individual litigation make it impossible for the members of the class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

19.    Questions of law and fact common to the members of the class predominate over any questions that may affect only individual members in that

Defendants have acted on grounds generally applicable to the entire class.  Among questions of law and fact common to the class are:

a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether Defendants omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c)      whether Defendants participated in and pursued the common course of conduct complained of herein;

d)      whether Defendants acted with scienter in omitting and/or misrepresenting material facts, and otherwise manipulating the market for Valley Forge's common stock;

e)      whether the price of Valley Forge's common stock was artificially inflated during the class period as a result of the material misrepresentations and omissions complained of herein;

f)      whether Louis Brothers was a control person of Valley Forge as alleged herein;

g)      whether  Larry Wilhide was a control person of Valley Forge as alleged herein; and

h)      whether members of the class have sustained damages and, if so, the proper measure of such damages.

## V.

## SUBSTANTIVE ALLEGATIONS

20.    Valley Forge is a technology company.  According to its public statements, Valley Forge has produced and sold aerospace products, primarily momentum wheels since it was formed.  Momentum wheels are used to store energy, similar to a battery, and are designed to provide an uninterrupted power

supply for various applications.   In addition to their use as energy storage, momentum wheels may also be used to stabilize satellites.

21.   Following the terrorist attacks on September 11, 2001, the Company shifted its focus from momentum wheels to developing and marketing counter-terrorism products.   Its primary counter-terrorism product is the THOR LV photonuclear detection system ("THOR"), which is designed to detect illicit narcotics, explosives and bio-chemical weapons hidden in cargo containers.   Its other product is ODIN, which is a weapons scanning device for use in scanning airline passengers, for example.

22.   Prior to going public in 2006, Valley Forge had spent close to $2 million dollars on research and development of its counter-terrorism products, financed in large part through personal advances from Brothers and other insiders, and from revenues generated from the sale of momentum wheels.   For example, during the first six months of 2006, Brothers advanced $491,527 to Valley Forge in large part to cover research and development costs.  Brothers and Wilhide each had a great deal to lose if the company failed.  By the end of 2006, Valley Forge had completed its research and development of the THOR and ODIN systems. But sales of THOR and ODIN had not materialized.  Moreover, the revenue from the Company's sale of momentum wheels was limited, sporadic and unreliable.  In 2007, the Company reported no revenues and in 2008 it had only sold $132,000 worth of momentum wheels.

23.   In the coming years, the Company would require millions of dollars to finance the production and marketing of the THOR and ODIN products.  With just over 60% of the Company's common stock, Brothers' and Wilhide's control over the Company would be jeopardized if the Company were required to issue millions of dollars worth of common stock to finance operations.

24.   Starting in 2009, and unbeknownst to Plaintiff and class members, the Company began the illegal exportation of millions of dollars worth of military

semiconductors to Hong Kong in violation of the United State's International Traffic In Arms Regulations ("ITAR").   Section 38 of the Arms Export Control Act gives the President of the United States the authority to control the export of "defense articles and defense services."   (22 U.S.C. §2778).   The President delegated that authority to the State Department, which promulgated the ITAR. The ITAR designates certain products as defense articles and requires exporters to obtain a permit or license to export such items to foreign persons or countries. Defense articles are generally products that a) are "specifically designed, developed, configured, adapted, or modified for a military application, and (i) [Do] not have predominant civil applications, and (ii) [Do] not have performance equivalent (defined by form, fit and function) to those of an article or service used for civil applications; or (b) [are] specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control. . ." is necessary.   The State department provides a list of the kinds and categories of articles covered by ITAR in what is called the "U.S. Munitions List." (ITAR Part 121).   An exporter can determine whether their product is controlled under the ITAR by submitting a "Commodity Jurisdiction Determination Form" (Form DS-4076).   In 2009, Valley Forge began exporting to Hong Kong semiconductors that were included on the U.S. Munitions List without obtaining a license or permit from the State Department.   These exports were illegal.   As a result of these illegal exports, the Company's revenues exploded:

### Valley Forge Reported Revenues 2004-2011

| Year | Annual Revenues |
|------|-----------------|
| 2004 | $662,510 |
| 2005 | $0 |
| 2006 | $417,592 |

| 2007 | $0 |
|---|---|
| 2008 | $132,000 |
| 2009* | $3,202,815 |
| 2010 | $18,675,269 |
| 2011 | $14,992,867 |
| **Total:** | **$39,870,951** |

*Marks the first year Valley Forge began exporting semiconductors to Hong Kong.

25.   Valley Forge did not disclose to investors, including Plaintiff and the Class, that it had exported any products to Hong Kong, or that it was doing so in violation of the law.

26.   Despite exporting tens of millions of dollars in semiconductors to Hong Kong, the Company reported to investors, including Plaintiff and the Class that all of its revenues were derived from the sale of momentum wheels and other mechanical devices.  Consistent with prior reports, in a Form 10-K (annual report) publicly filed and disseminated on March 30, 2012 and certified by Defendant Brothers, the Company represented to the public that "Historically, and in 2011, *all of the Company's sales* have been derived from [the sale of] momentum wheels and other mechanical devices." (emphasis added).

27.   The Company also publicly explained the sudden increase in revenues reporting that, "[t]o date, no revenues have been attributable to sales of ODIN or THOR.  All sales for the years ended December 31, 2011 and 2010 have been for aerospace products and other mechanical devices.  We have experienced an increase in revenues (from 2009) due to enhanced relationships with existing momentum wheel customers.  The company periodically receives a high profit margin order that exceeds the normal profit percentage of approximately 15%.  For the year ended December 31, 2011, the Company had two such orders that realized a gross profit of approximately $2,000,000."

28.   On April 1, 2010, Defendants released a press release on PR Newswire, a national press release service, publicly misrepresenting that "Valley Forge Composite Technologies, Inc. Division Receives a $4,000,000 Order for its Momentum Wheel Products."  Defendants disseminated this press release in San Diego, California, and throughout the United States.

29.   The increased revenues eliminated the Company's need to issue common stock and served to protect Brothers' and Wilhide's majority ownership position.  On April 11, 2011, the Company publicly released a 10-K, certified by Defendants Brothers, for the fiscal year ended 2010.  It reported that "[b]etween January 1, 2010 and December 31, 2010, our capital requirements have largely been met through sales of products other than THOR and ODIN.  We recorded sales of $18,675,269 from the sale of various products in 2010.  We anticipate that income from sales of such products will be sufficient to finance our ongoing capital requirements in 2011."

30.   The Company went on to report that "[h]istorically, we have relied on revenues, debt financing and sales of our common stock to satisfy our cash requirements.  For the years ended December 31, 2010, we received cash proceeds of $16,782,487 from sales of various products, $335,365 from customer deposits, and $245,714 from amounts paid to exercise warrants resulting in issuance of common stock.  For the year ended December 31, 2009 we received cash proceeds of $3,103,615 from revenues, $858,400 from deferred revenues and $337,500 from sales of our common stock.[1]  For the year ended December 31, 2010 we issued 6,631,854 shares of our common stock primarily as the result of the exercise of previously issued warrants and note conversions.  For the year ended December 31, 2009 we issued 3,273,571 shares of our common stock. . ."

---

[1] During the class period in 2009 and as part of its fraudulent scheme Defendants actively marketed and caused the Company to issue and sell thousands of its common stock at inflated prices directly to investors in private transactions in California, including San Diego, California.

31.     The Company further reported that "Management intends to finance our 2011 operations primarily through the revenue from product sales."  From 2011 through 2013, with limited exceptions, the Company financed its operations internally through revenues.     All of the Company's publicly disseminated misrepresentations alleged herein were authorized, reviewed and approved by Brothers and Wilhide.

32.     On February 6, 2013, the truth was revealed, shocking investors and causing an immediate collapse in the market price of Valley Forge's common stock.  The Company made the following public announcement:

> The Company is discussing with the U.S. Attorney for the Eastern District of Kentucky allegations that it exported over $37 million worth of military semiconductors to Hong Kong since about 2009 in violation of the International Traffic in Arms Regulations ("ITAR"). Although the Company's investigation is in its early stages, the Company has reason to believe that the vast majority of these exports involved commercial semiconductors that were clearly not subject to control under the ITAR, and were not controlled for export to Hong Kong under the Export Administration Regulations ("EAR").  The U.S. Attorney executed a search warrant on the Company and subsequently seized the bank accounts of the Company, which held approximately $1.5 million, reportedly on the basis that these funds were entirely the proceeds of illegal exports or an instrumentality thereof, which the Company denies.  The Company intends to seek judicial relief for return of its funds and the unsealing of the affidavit supplied in support of the forfeiture, which the Company has reason to believe contains allegations that are inaccurate with regard to the source of the seized funds and the characterization of its export activity.  If the Company is unsuccessful in obtaining such judicial relief in a timely manner or is unsuccessful in defending itself against such allegations, the Company could be materially and adversely affected.  Until the matter is resolved, the Company may not be able to sell momentum wheels and related components, which could adversely and materially affect the Company.

33.     Valley Forge's public statement is revealing.  First, it did not deny that it exported semiconductors to Hong Kong.  In addition, it stated that it has "reason to believe that the vast majority of these exports involved commercial semiconductors that were clearly not subject to control under the ITAR."  In other

words, Valley Forge admitted that it has reason to believe that some of the exports were subject to ITAR.

34.    In response to the news, Valley Forge's publicly traded common stock plunged in value, falling from 14.9 cents per share to 5.7 cents per share, on volume of 1.3 million shares, in a single day.

35.    Defendants had repeatedly misled Plaintiff and the Class during the Class Period by repeatedly representing that all of the Company's revenues were derived from the sale of momentum wheels to its long-term customers, and that its cash-on-hand was generated from legal sales activity.

36.    In addition, Defendants failed to disclose to Plaintiff and the Class that the Company was engaged in exporting products to Hong Kong and they failed to disclose the risk that such exports could be subject to ITAR and that its cash-on-hand was potentially subject to seizure by the U.S. Government.

37.    Since the announcement Valley Forge's stock price never recovered and now trades at approximately 3 cents per share.

38.    On February 13, 2013, following allegations of illegal activity, Brothers resigned as the Company's President, CEO, CFO and Chairman of the Board, effective immediately.

## CAUSATION ALLEGATIONS

39.    Valley Forge's common stock was publicly traded on the OTCBB market at all relevant times.  Defendants' material misrepresentations, omissions and manipulative contrivances had the effect of artificially inflating the price of Valley Forge's common stock and warrants.

40.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to Valley Forge's finances and operations or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading to the market. Defendants breached their duty by disseminating false or misleading information

regarding Valley Forge's conduct of exporting military semiconductors to Hong Kong in violation of United States law, as well as the fact that its cash holdings were potentially subject to seizure.  As a result of their failure to satisfy their duties, the price of Valley Forge's publicly traded stock was artificially inflated during the Class Period, damaging Plaintiff and the Class.

41.     Defendants' false and misleading statements and omissions in their public statements directly caused losses to Plaintiff and the Class.  On the strength of Defendants' false statements, misrepresentations and material omissions, Valley Forge's stock was artificially inflated to a Class period high of $2.64 per share on May 11, 2010 and remained artificially inflated until the end of the Class Period. Plaintiff and all Class Members who bought shares during the Class Period were harmed thereby when the share price plummeted upon revelation of the U.S. Attorney's investigation on February 6, 2013.

42.     Until the revelation of the U.S. Attorney's investigation and actions on February 6, 2013, Plaintiff and putative class members were unaware of all of the facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme by the exercise of reasonable diligence.

### ADDITIONAL SCIENTER ALLEGATIONS

43.     Defendants made each misrepresentation and/or omission of material fact alleged herein with reckless disregard for, or knowledge of its false and misleading nature.

44.     At all relevant times, Defendant Louis Brothers, as one of only a handful of employees, and in his position as President and CEO, and head of Valley Forge's marketing, was in a position to know, and indeed must have known that Valley Forge was actively engaged in the illegal export of military semiconductors to Hong Kong and that most of its revenues were derived from this illegal activity (not momentum wheels); and that its cash holdings were subject to seizure as fruit of illegal activity.  Indeed, Brothers was the officer at Valley Forge

who was involved in sales and marketing, and who had several years of experience in international business, including extensive connections and experience in China. Brothers had to know about the ITAR and the Munitions List, given his extensive experience in international trade in technology products. Brothers knew that Valley Forge's revenues increased by more than twenty-four times between 2008 and 2009, and that most of those revenues were derived from exporting semiconductors to Hong Kong- not momentum wheels.   Brothers in particular had an incentive to increase cash flow at Valley Forge in light of the hundreds of thousands of dollars the company owed him from prior loans, as well as the Company's desperate need for financing.  Indeed, in 2010 and 2011, thanks to its illegal export activities the Company repaid Brothers $175,000 in principal and interest owed on loans Brothers had made to the Company in past years.   Brothers further knew that disclosure of the illegal export activities would destroy the Company he founded and therefore had every reason to hide the truth.

45.     At all relevant times, Defendant Larry K. Wilhide, as one of only a handful of employees, and in his position as Vice President of Engineering at Valley Forge, was in a position to know, and indeed must have known that Valley Forge was actively engaged in the illegal export of military semiconductors to Hong Kong and that most of its revenues were derived from this illegal activity (not momentum wheels); and that its cash holdings were subject to seizure as fruit of illegal activity.  Wilhide had to know about the ITAR and the Munitions List, given his extensive experience in international trade in technology products.  He was intimately familiar with Valley Forge's products and knew what it was exporting and to where.  Finally, Wilhide, as one of two officers at Valley Forge, knew that Valley Forge's revenues increased by more than twenty-four times between 2008 and 2009, and that most of those revenues were derived from exporting semiconductors to Hong Kong.  He had an incentive to engage in the illegal exporting scheme in order to greatly increase revenues to the Company and

reduce or eliminate the its need to engage in equity financing.  Additional equity financing could have jeopardized Brothers' and Wilhide's majority ownership. Wilhide further knew that disclosure of the illegal export activities would potentially destroy the Company and therefore had every reason to hide the truth.

46.    Defendants Brothers and Wilhide had the opportunity to commit and participate in the fraud described herein.  As the two executive officers and controlling shareholders of Valley Forge, Brothers and Wilhide individually and collectively controlled Valley Forge's press releases, corporate reports, Securities and Exchange Commission filings and communications with analysts.  Thus Brothers and Wilhide controlled the public dissemination of and could falsify and/or omit, the material information about Valley Forge's exports and operations, as well as the source and legality of its cash holdings, that reached the public and affected the price of Valley Forge's common stock and derivative warrants.

47.    Defendants engaged in this intentional or deliberately reckless conduct in order to raise much needed cash without having to issue additional common stock in equity financing.  Moreover, Defendants had spent years of their lives and millions of dollars researching and developing counter-terrorism products that they were now in the process of marketing.  Brothers in particular had much to gain from the sale of Valley Forge's counter-terrorism products because he expected to earn commissions.  But while they sought to market the THOR and ODIN product lines, Valley Forge needed capital to continue operations.  Brothers and Wilhide did not want to lose their majority share of Valley Forge.  Thus, increasing revenues by exporting illegal semiconductors to Hong Kong provided millions of dollars in additional revenues.  The effect was that the Company received substantial additional capital without having to sell a substantial share of Valley Forge.  Brothers and Wilhide were able to achieve their goal of raising funds to continue operations and maintaining a controlling share of Valley Forge.

48.    The combination of attributable knowledge and evident financial incentives for Brothers and Wilhide creates a strong inference of scienter.

## FRAUD ON THE MARKET ALLEGATIONS

49.    At all relevant times, the market for Valley Forge's common stock was an efficient market for the following reasons, among others:

a.    During the Class Period, Valley Forge's common stock was actively traded on the over-the-counter market, a highly efficient national securities market.  During the Class Period, Valley Forge had tens of millions of shares outstanding.  In or about March 30, 2012, it had roughly 62.4 million shares outstanding.

b.    As a registered and regulated issuer of securities, Valley Forge filed periodic reports with the Securities and Exchange Commission described in this complaint;

50.    As a result of the above, the market for Valley Forge securities promptly digested current information with respect to Valley Forge from all publicly available sources and reflected such information in Valley Forge's stock prices.  Under these circumstances, all purchasers of Valley Forge stock during the Class Period suffered similar injury through their purchase of securities at prices, which were artificially inflated by Defendants' manipulative activities.  Thus, a presumption of reliance applies.

## VI.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violations of § 10(b) of the Securities Exchange Act of 1934**

**and Rule 10b-5 Promulgated thereunder**

**(Against All Defendants and DOES 1-100)**

51.    Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

52.     Valley Forge common stocks are securities.

53.     During the Class Period, Defendants Valley Forge, Brothers and Wilhide engaged in a plan, scheme and course of business which operated as a fraud upon Plaintiff and the Class, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class set forth above.  The purpose and effect of this scheme was to induce Plaintiff and the Class to purchase Valley Forge's common stock during the Class Period at artificially inflated prices.

54.     By reason of the foregoing, Defendants knowingly and/or recklessly violated Section 10(b) of the Securities Exchange Act of 1934 (hereafter "Exchange Act") and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and the Class in connection with their purchases of Valley Forge's common stock during the Class Period.

55.     As a result of the foregoing, the market price of Valley Forge's common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations described above, Plaintiff and the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities.  Plaintiff and the Class would not have purchased Valley Forge common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions.  At the time of the purchase of Valley Forge's stock by Plaintiff and the

Class, the fair market value of said common stock and the derivative warrants was substantially less than the price paid by Plaintiff and the Class. Plaintiff and the Class have suffered substantial damages as a result.

## SECOND CLAIM FOR RELIEF

### Violations of § 20(a) of the Securities and Exchange Act of 1934
### (Against Defendants Brothers, Wilhide and DOES 1-100)

56.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

57.     Defendants Brothers and Wilhide are jointly and severally liable for Valley Forge's material misrepresentations and omissions complained of herein under §20(a) of the Exchange Act in that they each functioned as a control person of Valley Forge by virtue of their respective executive and directorial positions with the company, as well as their knowledge of and involvement in the business of Valley Forge, their daily access to confidential information regarding the operations and finances of Valley Forge, and their power and ability to make public statements on behalf of Valley Forge to shareholders, potential shareholders and the SEC during the Class Period. As such, they had the power and ability to control Valley Forge's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and appointing Plaintiff as representatives of the Class and Krause Kalfayan Benink & Slavens, LLP as Plaintiff Class counsel;

B.     Compensatory Damages in an amount to be determined at trial, together with interest thereon;

C.     Pre-judgment interest at the maximum rate allowable at law;

D.      Reasonable attorney's fees;

E.      Court costs and expert witness fees;

F.      Such other and further relief as the Court deems just and proper, including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff and the Class have an effective remedy.


Dated: September 25, 2013                    KRAUSE KALFAYAN BENINK &
                                             SLAVENS, LLP


                                             s/ *Vincent D. Slavens*
                                             Vincent D. Slavens, Esq.
                                             *Attorneys for Plaintiff*


                         DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: September 25, 2013                    KRAUSE KALFAYAN BENINK &
                                             SLAVENS, LLP


                                             s/ *Vincent D. Slavens*
                                             Vincent D. Slavens, Esq.
                                             *Attorneys for Plaintiff*